IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JASON MCDANIEL,

     Plaintiff,

     v.

JOHN C. PHELAN,
SECRETARY OF THE NAVY, *et al.*,

     Defendants.

Case No. 2:25-cv-72

## OPINION & ORDER

Defendants John C. Phelan, Jane Ann Barclift, Douglas Marshall, and Maggie Radich move to dismiss Plaintiff Jason McDaniel's claims of hostile work environment, discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. ECF Nos. 12 (motion), 13 (memorandum). The plaintiff seeks to amend the complaint to clarify the scope of his claims, cure various deficiencies, and add related claims.[1] ECF Nos. 46 (motion), 46-1 (memorandum), 33-1 (memorandum).

Because the proposed amendments satisfy Fed. R. Civ. P. 15(a) standards, and because allowing the plaintiff to amend his complaint resolves the only meritorious issue set forth in the defendants' motion to dismiss, the motion for leave to amend

---

[1] The Court dismissed as moot the plaintiff's previous motions to amend to avoid unnecessary redundancy. ECF No. 49; ECF No. 43. However, the Court will consider the information contained in those fully briefed motions in arriving at its determination on the plaintiff's most recent motion to amend, ECF No. 46.

will be **GRANTED**, and the motion to dismiss will be **DENIED** as to failure to state a claim and will be **DENIED AS MOOT** as to lack of personal jurisdiction and insufficient service of process.

## I.    BACKGROUND

At this stage, the Court assumes the facts alleged in the proposed amended complaint are true.[2] ECF No. 46-4. The plaintiff is a dark-skinned African American male and a resident of Greenbelt, Maryland. *Id.* ¶¶ 2, 6. At all relevant times, the plaintiff has been employed by the U.S. Department of the Navy ("Navy"), Commander Naval Surface Forces Atlantic ("COMNAVSURFLANT"), Executive Directorate ("NO2") Division and/or Naval Information Systems Command ("NAVIFOR"), as a program specialist, GS-12 or GS-13, in Norfolk, Virginia. *Id.* ¶¶ 3, 6, 101.

The plaintiff's original complaint names four defendants: Terence G. Emmert, Acting Secretary of the U.S. Department of the Navy; Jane Ann Barclift, executive director at NO2 during the relevant period; Douglas Marshall, Surface Analytical Group ("SAG") director at NO2 for portions of such period; and Maggie Radich, director of sustainment and readiness at NO2. ECF No. 1 at 1, 4 ¶¶ 7–9. Barclift, Marshall, and Radich present as white-skinned Caucasians. ECF No. 46-4 ¶¶ 13–14, 36. The sole named defendant in the proposed amended complaint is John C. Phelan,

---

[2] The motion to amend refers to the operative pleading as the "[s]econd [a]mended [c]omplaint," ECF No. 46-1 at 5, but because the Court has mooted the prior motions, the Court will simply refer to the pleading as the amended complaint throughout this Opinion and Order.

Secretary of the U.S. Department of the Navy; however, the alleged conduct of the previously named defendants remains relevant to the plaintiff's claims under the theory of *respondeat superior. Id.* ¶¶ 119, 132, 146, 158, 170, 182.

In July 2021, the plaintiff filed a formal Equal Employment Opportunity (EEO) complaint (No. 21-36001-01233) against the Navy and Barclift. ECF No. 46-4 ¶ 13. The resulting settlement included a non-disclosure agreement. *Id.* Thereafter, on or about March 10, 2022, Barclift hired Marshall as a member of SAG, a non-supervisory position.[3] *Id.* ¶ 14. Shortly thereafter, Barclift ordered Marshall to be the plaintiff's "unofficial" first-line supervisor, a role he remained in until June 16, 2023, although Barclift continued to closely monitor the plaintiff and approve his timecards. *Id.* ¶¶ 15–16. Marshall knew about the plaintiff's prior EEO complaint. *Id.* ¶¶ 17–18.

In March 2022, the plaintiff applied for promotion to the vacant GS-14 director of sustainment and readiness position. ECF No. 46-4 ¶ 24. His resume was vetted by several senior officers with "extensive" military experience and insights into the qualifications necessary for the role, and several of these officers wrote recommendation letters for the plaintiff, recognizing his performance over the previous year. *Id.* The plaintiff was not granted an interview and thereafter learned that Barclift had pre-selected a white-skinned Caucasian individual with no prior EEO activity, despite the plaintiff's superior qualifications. *Id.* ¶¶ 24–25. The pre-

---

[3] Sometime between March and June 2022, Marshall became the SAG director. *Id.* ¶ 15.

selected individual declined the unsolicited job offer, and the position remained unfilled for another year. *Id.* ¶ 25.

The plaintiff applied for the same position again in February 2023 and was granted an interview. ECF No. 46-4 ¶ 26. Around that same time, Barclift began making disparaging remarks to the plaintiff, including how he needed to "learn how to speak plain English," referring to the plaintiff's "cultural dialect." *Id.* ¶ 27. Then, in March 2023, Barclift called the plaintiff into her office for a "debrief," where she "happily" told the plaintiff that she did not select him for the position, even though he was already successfully performing many of the duties of that position. *Id.* ¶¶ 29–30. Instead, Barclift selected a lesser qualified, white-skinned Caucasian person for the position—Kimberly Waldrop. *Id.* ¶¶ 22, 31. When Waldrop left the position a few months later, Barclift appointed another white-skinned Caucasian individual—Maggie Radich, a contractor with no civil service or engineering experience—to the GS-14 position. *Id.* ¶¶ 31, 36.

The plaintiff filed a second informal EEO complaint on or about April 25, 2023, alleging a pattern of discriminatory hiring practices. ECF No. 46-4 ¶¶ 26, 33. During the EEO investigation, Marshall claimed that Barclift was responsible for the plaintiff's non-selection, but Barclift claimed that Marshall was responsible. *Id.* ¶ 32.

On April 27, 2023, two days after the plaintiff filed his informal EEO complaint, Marshall made the following comments during a staff meeting: "I have [sic] a few life altering things happen over the past few weeks, but I submit that you should be careful what you do on a job because you never know who knows who;" "be

mindful not to burn bridges because you could end up working for someone or not;" and "what you do could—or will—come to bite you." ECF No. 46-4 ¶ 34. Marshall "concluded by congratulating [] Waldrop on her selection for the GS-14 position." *Id.* The plaintiff perceived these comments as threatening and aimed at dissuading him from proceeding with his EEO complaint. *Id.*

Marshall also repeatedly and arbitrarily reassigned work away from the plaintiff to his "Caucasian and white coworkers." ECF No. 46-4 ¶ 19. Many of the plaintiff's duties were reassigned to Waldrop, a program analyst, GS-0343-13, who held an essentially identical position to the plaintiff but reported directly to Barclift. *Id.* ¶¶ 22–23. And when the plaintiff completed an assignment, Marshall assigned credit to the plaintiff's non-African American and non-Black coworkers with no prior EEO activity, which negatively impacted the plaintiff's promotion potential and career trajectory. *Id.* ¶ 20.

In mid-June 2023, Marshall transferred out of Barclift's chain of command. ECF No. 46-4 ¶ 38. Although Barclift was the plaintiff's first-line supervisor, she referred to herself as the plaintiff's "unofficial" first-line supervisor in communications with the plaintiff and others. *Id.* ¶ 39.

In early July 2023, the plaintiff filed his second formal EEO complaint (No. 23-53825-00912), alleging race and color discrimination, hostile work environment, and reprisal based on his previous EEO complaints. ECF No. 46-4 ¶ 40. One month later, Barclift began "engaging in an ongoing pattern of manipulating [the plaintiff's] timecards[,] harassing him about leave[,] . . . [and] accus[ing the plaintiff] of

improprieties." *Id.* ¶ 41–42. For instance, Barclift: accused the plaintiff of timecard fraud regarding a timecard that Barclift had previously certified, *id.* ¶ 41; repeatedly demanded that the plaintiff explain his request to telework when a water pipe broke in his home and he needed to address the leak to avoid extensive damage, *id.* ¶¶ 43–44; admonished the plaintiff for communicating with Barclift by text message, despite previously stating this was an acceptable method of communication, *id.* ¶ 45; and denied, without explanation, the plaintiff's request that Barclift identify an official first-line supervisor to whom he could report, *id.* ¶ 46.

On or about September 21, 2023, Barclift named Radich, the individual most recently appointed to the GS-14 position to which the plaintiff repeatedly applied, as the plaintiff's "unofficial" first-line supervisor with respect to select supervisory duties, including time sheet approval. ECF No. 46-4 ¶ 47. Thereafter, Radich joined Barclift—at Barclift's direction—in a series of actions the plaintiff perceived as harassing, discriminatory, and retaliatory. *Id.* ¶ 48. In late October, Barclift deleted a midpoint performance review the plaintiff had added to his personnel record, then directed Radich (who complied) to accuse the plaintiff of failing to submit the review prior to Barclift's deadline. *Id.* ¶ 49. The next day, Radich deleted a time sheet submitted by the plaintiff, which prevented the plaintiff from getting paid for that pay period. *Id.* ¶ 50.

On November 6, 2023, Barclift and Radich held a "counseling session" in which they vaguely alleged misconduct by the plaintiff, without providing him with details. *Id.* ¶ 54. At the conclusion of the meeting, Barclift and Radich presented the plaintiff

with a "Letter of Expectations," which the plaintiff was not permitted to keep a copy of, and ordered him "not to communicate with other [workplace] minorities," whom Barclift and Radich accused the plaintiff of harassing. *Id.* ¶¶ 56–57. But when the plaintiff contacted Human Resources for more information, HR was "unaware of any allegations against him." *Id.* ¶ 55.

Beginning in or around the week of November 13, 2023, Barclift and Radich routinely ordered the plaintiff to attend "unnecessary" meetings at times that forced him to forfeit the benefits of his maxiflex schedule.[4] ECF No. 46-4 ¶¶ 58–59. On one occasion, Barclift "accosted" the plaintiff for not attending a meeting that Radich ordered him not to attend. *Id.* ¶ 53. And Radich ordered the plaintiff to attend an unnecessary meeting after the plaintiff "had already worked his requisite hours for that pay period" and had been "ordered not to work over his allotted hours for a given week." *Id.* ¶ 58.

The aforementioned actions of Barclift and Radich continued to "spiral out of control" until December 2023, when the plaintiff took 12 weeks of FMLA leave "to escape . . . the unbearable hostile work environment." ECF No. 46-4 ¶ 60. While the plaintiff was on leave, Mikel Vick, an African American male with a lighter skin complexion than the plaintiff, was hired as a civil government employee, program specialist, GS-13. *Id.* ¶ 61. When the plaintiff returned from leave in March 2024, Barclift and Radich stripped the plaintiff of most of his job duties, assigning them to

---

[4] The plaintiff had a maxiflex schedule due to the nature of his position, which often required him to work outside of normal business hours to communicate with individuals in different time zones. *Id.* ¶¶ 59, 84

Vick. *Id.* ¶¶ 62–63, 79. Radich and Barclift also instructed the plaintiff not to interact with senior officials without their prior approval. *Id.* ¶ 64. And when the plaintiff attempted to contribute his subject matter expertise during meetings, Radich and Barclift frequently dismissed him; however, they accepted identical input from similarly situated employees with lighter skin and no prior EEO activity, such as Vick and Waldrop, as "invaluable insight." *Id.* ¶ 65.

In late March 2024, Radich issued the plaintiff a letter of reprimand based on "vague references to misconduct." ECF No. 46-4 ¶ 68. In late April, Barclift issued the plaintiff a negative mid-year performance review that contained misleading information and characterized his work as "subpar to mediocre;" Barclift refused to discuss the ratings with the plaintiff and directed the plaintiff to Radich, who also refused to meet with the plaintiff. *Id.* ¶¶ 69–70. In late July, Barclift accused the plaintiff of sexually harassing two anonymous contractors and launched a baseless investigation against him. *Id.* ¶¶ 71–74. The plaintiff provided proof that he was not working on the date of the alleged incidents, and the allegations were ultimately deemed unfounded. *Id.* ¶¶ 73, 75. Beginning in July 2024 and continuing into at least August 2024, Radich "openly bragged" to the plaintiff in front of his co-workers that she would do "whatever was necessary" to have him terminated. *Id.* ¶ 76.

Plaintiff again took FMLA leave to "escape the Agency's hostile work environment." ECF No. 46-4 ¶ 79. While on leave, Barclift and/or Radich altered the plaintiff's timecards to reflect that he was working and owed a paycheck, even though he was on unpaid leave, so that Barclift and Radich would be able to accuse the

plaintiff of timecard fraud. *Id.* ¶¶ 81–83. This forced the plaintiff to return early from leave, at which time Barclift ordered the plaintiff to work normal duty hours, despite knowing of his previous maxiflex schedule. *Id.* ¶¶ 80, 84.

The plaintiff reported Radich and Barclift's ongoing discrimination, harassment, and reprisal to senior management on at least eight separate occasions between August 2023 and January 2025.[5] ECF No. 46-4 ¶¶ 51, 77, 85. Although a meeting between the plaintiff and the Force Judge Advocate was scheduled after the plaintiff's August 2023 report, no action was taken to resolve the plaintiff's concerns at that time or at any time thereafter, and the harassment continued. *Id.* ¶¶ 78, 93–94.

The plaintiff's last report of harassment by Radich, Barclift, Captain Eric Kellum ("Capt. Kellum"), and Rear Admiral Joseph F. Cahill[6] ("RADM Cahill") on or about January 10, 2025, was followed by "swift adverse actions." ECF No. 46-4 ¶¶ 85, 94. On January 21, 2025, Radich denied the plaintiff's request for comp time performed beyond his tour of duty on January 15, 2025. *Id.* ¶¶ 95–96. On January 30, 2025, the Navy launched another "baseless" investigation into the plaintiff based on Radich's false allegations of harassment. *Id.* ¶ 97. And on February 11, 2025, Barclift again prevented the plaintiff from being selected for a promotion—this time, to a

---

[5] August 8, 2023; September 19, 2023; October 8, 2023; November 3, 2023; August 30, 2024; November 14, 2024; December 20, 2024; January 10, 2025. ECF No. 46-4 ¶ 77.

[6] Capt. Kellum and RADM Cahill were Agency senior management and/or supervisors in the plaintiff's chain of command during the relevant period. ECF No. 46-4 ¶¶ 77, 85, 103, 158, 170, 182. The plaintiff does not provide details regarding the alleged harassment perpetrated upon him by Capt. Kellum and RADM Cahill. *See id.* ¶ 94.

general engineer position in another command. *Id.* ¶ 98. As a result of these incidents, the plaintiff filed a third informal EEO complaint on February 12, 2025. *Id.* ¶ 99.

On or about February 18, 2025, the Navy transferred the plaintiff to a GS-12 position in a different command "under the guise that it would remove him from [] Barclift's supervision and/or distance [] Barclift from him"—but the transfer did neither of those things and instead demoted him from a GS-13 to a GS-12, decreasing his pay and promotion potential, isolating him from peers, and formally removing his contracting officer representative responsibilities. ECF No. 46-4 ¶¶ 100–01. The plaintiff reported his concerns that the transfer and demotion constituted further discrimination and harassment. *Id.* ¶ 102.

To date, the Navy has not issued a final decision as to the plaintiff's second formal EEO complaint. ECF No. 46-4 ¶¶ 86–92. Despite contacting numerous individuals in and outside his chain of command,[7] the plaintiff continues to experience ongoing harassment, disparate treatment, and retaliation in the workplace. *Id.* ¶¶ 93, 103. On April 3, 2023, the plaintiff filed his third formal EEO complaint (No. 25-53825-00650) alleging discrimination, hostile work environment, and reprisal based on his previous EEO complaint. *Id.* ¶ 105.

The defendants move to dismiss the plaintiff's claims for lack of subject matter jurisdiction, lack of personal jurisdiction due to insufficiency of service of process, and failure to state a claim. ECF Nos. 12 (motion), 13 (memorandum).

---

[7] Radich; Barclift; RADM Cahill; COS Walch; COS Kellum; JAG Ryan Santicola; Michelle Dyer, labor and employee relations; Brian Ensogna, human resources officer; JoEllen Rolse, SAG deputy director. *Id.* ¶ 103.

The plaintiff seeks to amend his complaint to "clarify the fact that in addition to bringing hostile work environment claims on the basis of [] race, color, and reprisal, he also is raising disparate treatment claims on each of those bases as well." ECF No. 35 at 3. The proposed amended complaint seeks to provide clarification by separating the plaintiff's hostile work environment and discrimination claims (thereby increasing from three to six total counts—three counts of hostile work environment and three counts of disparate treatment discrimination). ECF No. 46-4 ¶¶ 108–185.

Next, the plaintiff seeks to cure deficiencies identified by the defendants' motion to dismiss, which asserts that the Court should dismiss the plaintiff's claims against Defendants Barclift, Marshall, and Radich because individual supervisors are not proper defendants under Title VII. ECF No. 13 at 10–11. The plaintiff's proposed amended complaint removes the individual supervisors, leaving "the only proper defendant for [the p]laintiff's claims[:] John C. Phelan, in his official capacity as the Secretary of the Navy." *Id.* at 11; ECF No. 46-4 at 2. The plaintiff's proposed amended complaint also updates the Secretary of the Navy to the individual who currently holds that position, as the original complaint erroneously identified Terence G. Emmert as the current acting secretary. ECF No. 46-4 at 2; ECF No. 1 at 1.

The plaintiff also seeks to add the following new factual allegations in support of his existing claims: Marshall became aware of the plaintiff's prior EEO complaint when he took over as the plaintiff's supervisor, ECF No. 46-4 ¶ 17; Marshall told the plaintiff during a May 2022 meeting that he was aware of the plaintiff's EEO complaint, *id.* ¶ 18; the plaintiff was required to report to supervisors regarding the

11

scope of his work when teleworking, *id.* ¶ 21; Marshall unjustifiably issued the plaintiff a letter of expectations, *id.* ¶ 28; details about reporting the alleged discrimination, harassment, and retaliation up his chain of command, *id.* ¶¶ 51, 77–78, 85, 139; "additional information about his comparators," ECF No. 33-1 at 3, specifically, that Mikel Vick's supervisors were Radich and Barclift, ECF No. 46-4 ¶ 61; that Vick is "able to corroborate that [the plaintiff] was treated disparately," ECF No. 33-1 at 3; ECF No. 46-4 ¶ 65; information about colleagues' perception of the Navy's conduct, ECF No. 46-4 ¶¶ 66, 118, 131; and claims included in his third formal EEO complaint—including denial of comp time, the launching of a second baseless investigation against him, non-selection for a general engineer position, and transferring him with a demotion, ECF Nos. 46-1 at 1, 46-2 at 1, 46-4 ¶¶ 95–101.

The defendants oppose the plaintiff's motion to amend in its entirety. ECF No. 40; ECF No. 47. First, the defendants argue that amendment would be futile because the plaintiff fails to allege sufficient facts to support plausible claims for hostile work environment, discrimination, or retaliation. ECF No. 40 at 3; ECF No. 47 at 4, 8–11. And the defendants also argue that the plaintiff has not exhausted his administrative remedies with respect to the claims contained within his third EEO complaint. ECF No. 47 at 3–4.

## II.    LEGAL STANDARDS

### A.    Motions to Amend Under Fed. R. Civ. P. 15[8]

Under Fed. R. Civ. P. 15(a)(2), courts are directed that leave to amend shall be freely given "when justice so requires." Accordingly, leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (quotation marks and citation omitted).

#### i.    *Prejudice*

Prejudice is often determined by the nature of the amendment and its timing. *Laber*, 438 F.3d at 427. District courts in the Fourth Circuit require the party opposing amendment to demonstrate prejudice if it exists. *E.g., Atl. Bulk Carrier Corp. v. Milan Exp. Co.*, No. 3:10-cv-103, 2010 WL 2929612, *4 (E.D. Va. July 23, 2010); *Hardwire, LLC v. Ebaugh*, No. 1:20-cv-304, 2021 WL 3809078, at *11 (D. Md. Aug. 26, 2021).

"A common example of a prejudicial amendment is one that raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant, and is offered shortly before or during trial." *Laber*, 438 F.3d at 427 (quotation marks and citation omitted) (alteration accepted). On the other hand, an amendment is likely not prejudicial if "it merely adds an additional theory of recovery

---

[8] There is no scheduling order in this case. Therefore, the plaintiff's motion to amend has not passed a scheduling order deadline, and this Court does not need to conduct a Rule 16(b) good cause analysis. Fed. R. Civ. P. 16(b); *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 297 (4th Cir. 2008).

to the facts already ple[ade]d and is offered before any discovery has occurred." *Id.*

"[A]bsence of prejudice, though not alone determinative, will normally warrant

granting leave to amend." *David v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.

1980) (allowance of the amendment could not prejudice the defendant, who "was from

the outset made fully aware of the events giving rise to the action").

### ii.    *Bad Faith*

Bad faith is "dishonesty of belief or purpose." *United States ex rel. Nicholson v.*

*MedCom Carolinas, Inc.*, 42 F.4th 185, 198 (4th Cir. 2022) (quoting Bad Faith,

BLACK'S LAW DICTIONARY (8th ed. 2004)) (quotation marks omitted and

alterations accepted). It captures "act[ing] for the wrong reasons . . . lying, deceiving,

playing unjustifiable hardball, slacking off, intentionally causing confusion, []

stubbornly refusing to follow rules," or even "noticing someone's mistake and saying

nothing about it." *Id.*

### iii.    *Futility*[9]

Courts deny leave to amend for futility when the proposed amendment is

"clearly insufficient or frivolous on its face" or "fails to withstand Rule 12(b)(6)

scrutiny." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021).

Such deficiencies must be "obvious on the face of the proposed amendment." *Johnson*

*v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). "To survive a [Fed. R. Civ. P.

12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter,

---

[9] Because the futility analysis encompasses the Fed. R. Civ. P. 12(b)(6) standard
applicable to the defendants' motion to dismiss, the Court does not include a separate
section on that standard.

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must take all the factual allegations in the complaint as true." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### B.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), a defendant may challenge the court's subject matter jurisdiction by contending that the complaint fails to include allegations that could establish subject matter jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When the defendant asserts the complaint fails to allege a factual basis for subject matter jurisdiction, the court's analysis mirrors its Rule 12(b)(6) analysis, and the relevant inquiry is whether the facts alleged in the complaint, taken as true, are sufficient to invoke subject matter jurisdiction. *Id.*

### C.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(2)

"Absent consent, the exercise of personal jurisdiction must comport with the requirements of the Due Process Clause"—among them, valid service of process. *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2020); *Koehler v. Dodwell*, 152 F.3d 304, 306 (4th Cir. 1998). Thus, before a federal court may exercise personal jurisdiction over a defendant, a summons must be issued and served in accordance with the Federal Rules of Civil Procedure. *Omni Cap. Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1353 (3d ed. 2023) ("The procedural requirements for proper

service are set forth in Federal Rule of Civil Procedure 4 and they are incorporated by Rule 12(b)"). When service of process is deficient, dismissal is proper under Fed. R. Civ. P. 12(b)(2). *Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984).

Where a plaintiff brings a claim against a United States agency, officer, or employee in their official capacity, Fed. R. Civ. P. 4(i) requires that a plaintiff: (1) deliver a copy of the summons and the complaint to the U.S. attorney for the district where the action is brought, or send a copy of each by registered or certified mail; (2) send a copy of the summons and the complaint to the U.S. Attorney General; and (3) send a copy of the summons and the complaint by registered or certified mail to the agency, officer, or employee. Fed. R. Civ. P. 4(i)(1), (2). The plaintiff bears the burden of establishing proper service of process by a preponderance of the evidence. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993).

### D.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(5)

Under Fed. R. Civ. P. 12(b)(5), a court may dismiss a complaint for insufficient service of process. "A [Fed. R. Civ. P.] 12(b)(5) motion is the proper vehicle for challenging the mode of delivery, the lack of delivery, or the timeliness of delivery of the summons and complaint." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1353 (3d ed. 2023). "An appropriate objection under [Fed. R. Civ. P.] 12(b)(5) would be the nonreceipt by the defendant of a summons, . . . or any other failure to comply with the procedural requirements in the applicable service provisions"—in this case, Fed. R. Civ. P. 4(i)(1) and (2). *Id.*

16

## III.   ANALYSIS

### A.   Motion to Amend

At the outset, the Court will grant amendment to separate the plaintiff's hostile work environment and discrimination claims into separate counts. Although Counts I, II, and III of the original complaint were titled "Race Discrimination," "Color Discrimination," and "Retaliation," respectively, it was clear from the face of the complaint that the plaintiff was also bringing claims of hostile work environment based on race, color, and retaliation. ECF No. 1 ¶¶ 88–103. Nevertheless, the defendants' motion to dismiss appears to only recognize the plaintiff's hostile work environment claims, *see* ECF No. 13 at 16–23, which indicates to the Court that amendment to clarify the full scope of the plaintiff's claims is prudent.

Additionally, the Court will dispose of two of the Fed. R. Civ. P. 15(a) factors— prejudice and bad faith—as the defendants do not raise either. *See Atl. Bulk Carrier*, 2010 WL 2929612, at *4. Although the defendants need not affirmatively raise bad faith as they must raise prejudice, there is no evidence that the plaintiff is acting with "dishonesty of belief or purpose" here. *MedCom Carolinas, Inc.*, 42 F.4th at 198.

Regarding the third and final Fed. R. Civ. P. 15(a) factor, the plaintiff's proposed amendments would not be futile because they support claims that pass muster under Fed. R. Civ. P. 12(b)(6).[10]

---

[10] Because the futility analysis is duplicative of the 12(b)(6) analysis this Court must address in considering the defendants' motion to dismiss, the analysis as to both is addressed here.

### i.        *Discrimination Claims (Counts IV and V)*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1). The plaintiff alleges that his employer acted discriminatorily by failing to promote him.[11] Absent direct evidence, the elements of a *prima facie* case of discriminatory failure-to-promote[12] under Title VII are: (1) membership in a protected class; (2) application for a specific position; (3) qualification for that position; and (4) the employer rejected the plaintiff's application "under circumstances that give rise to an inference" of discrimination. *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004)).

---

[11] To have standing to file suit under Title VII, a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir.2000). And discrimination suits that "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof . . . are procedurally barred." *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (citation and quotation marks omitted). The plaintiff alleges numerous adverse employment actions. However, he asserts that discriminatory failure-to-promote "form[ed] the basis" of the EEOC claim, and he only vaguely refers to also raising allegations of "earlier discriminatory practices." ECF No. 1 ¶ 26; *see also id.* ¶ 40 (stating that the plaintiff's second formal EEO complaint alleged "several instances of race and color discrimination" without providing specific instances). Therefore, this analysis focuses on the failure-to-promote allegation.

[12] Generally, the elements of a *prima facie* case of discrimination under Title VII are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010); *see also McDonnell Douglas v. Green*, 411 U.S. 792, 802–05 (1973) (establishing the four-element framework). However, when the alleged adverse employment action is discriminatory failure-to-promote, there is a four-element framework tailored to that issue. *See Walton*, 33 F.4th at 176.

To satisfy Fed. R. Civ. P. 12(b)(6), "an employment discrimination plaintiff need not plead [facts establishing] a *prima facie* case of discrimination," but instead must "allege facts to satisfy the elements of a cause of action created by" Title VII. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)) (quotation marks and other citation omitted) (italics added). The complaint must contain "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." *McCleary-Evans v. Md. Dept. of Transp., State Highway Admin.*, 780 F.3d 582, 585 (2015) (quoting *Twombly*, 550 U.S. at 555). Accordingly, although proof of the four elements of a *prima facie* case of discriminatory failure-to-hire is not required at this juncture, the plaintiff must plausibly allege facts sufficient to meet these elements. *See id.*

As the plaintiff has met all four elements, he states a plausible claim for race and color discrimination under Title VII. Regarding the first element, the plaintiff identifies himself as a dark-skinned, African American man, ECF No. 46-4 ¶¶ 2, 6, satisfying the requirement of membership within a protected class based on his race and color.[13] *See Coleman*, 626 F.3d at 190; 42 U.S.C. § 2000e-2(a)(1) (identifying race and color as protected classes under Title VII).

---

[13] "Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 n.5 (4th Cir. 2002). "[C]olor discrimination can occur between persons of different races or ethnicities, or between persons of the same race or ethnicity." U.S. Equal Emp. Opportunity Comm'n, *Facts About Race/Color Discrimination*, https://www.eeoc.gov/fact-sheet/facts-about-racecolor-discrimination (last visited February 10, 2026). The plaintiff alleges that he was passed over for promotion not only in favor of candidates of another race but also in favor of candidates of a different

With respect to the second element, the plaintiff plausibly alleges that he applied for the vacant GS-14 director of readiness and sustainment position on two separate occasions, in March 2022 and March 2023. ECF No. 46-4 ¶¶ 24, 26. He plausibly alleges that he was qualified for that position, as he received recommendation letters from several senior officers who had extensive experience and knowledge regarding the position qualifications, reviewed the plaintiff's resume, and recommended him after "recognizing his performance over the past year," *id.* ¶ 24; additionally, the plaintiff was already successfully performing many of the GS-14 position duties, *id.* ¶ 30. Thus, the plaintiff has also met his burden as to the third element.

As for the final element, the plaintiff plausibly alleges that Barclift rejected the plaintiff's application for promotion under circumstances that support a reasonable inference of discrimination based on race and color. Evidence that the position "remained open or was filled by similarly qualified applicants outside the [plaintiff's] protected class" is sufficient to support an inference of discrimination. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005). The first time the plaintiff applied for promotion, he was not granted an interview, and Barclift offered the position to a white-skinned Caucasian individual who possessed inferior qualifications and had not applied for the position. ECF No. 46-4 ¶¶ 24–25. After the unsolicited job offer was declined, the position remained unfilled for a year. *Id.* ¶ 25.

---

skin tone. And the plaintiff also states that his second formal EEO complaint alleged discrimination on the basis of both race and color. ECF No. 46-4 ¶ 40.

The plaintiff later reapplied and was selected for an interview, but Barclift again selected a lesser-qualified, white-skinned Caucasian individual. ECF No. 46-4 ¶¶ 22, 26, 31. And when the selected individual left that position a few months later, Barclift filled the vacancy with another lesser-qualified, white-skinned Caucasian individual. *Id.* ¶¶ 31, 36. Though the plaintiff alleges additional facts that could also support a reasonable inference of discriminatory failure-to-promote, the aforementioned allegations suffice.[14]

Accordingly, because the plaintiff has pleaded facts that plausibly allege discriminatory failure-to-promote on the basis of race and color, the motion to amend to add facts relevant to Counts IV and V will be granted.[15]

---

[14] The plaintiff alleges that he possessed "plainly superior qualifications" over the hired individuals, or that they were "much less qualified," but regarding the first two individuals selected to fill the vacancy, the plaintiff provides no explanation regarding his comparators' level of experience or background. ECF No. 46-4 ¶¶ 25, 31. And regarding the third individual, the plaintiff only alleges that she had "no civil service or engineering experience." *Id.* ¶ 36. Even if the plaintiff's comparator allegations are conclusory, because the GS-14 position remained open for a full year after the plaintiff's initial application for the position, he has established a plausible basis for believing that his failure to be hired (or even granted an interview) was attributable to race or color discrimination. *See Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (A plaintiff "is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim."); *see also Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 648–49 n.4 (4th Cir. 2002) (a plaintiff need not prove she was better qualified than a successful applicant if other circumstantial evidence suggests discrimination).

[15] The Court's 12(b)(6) analysis as to the plaintiff's discrimination claims relies on facts already alleged in the original complaint. ECF No. 1. Those facts sufficiently plead discriminatory failure-to-hire based on race and color. However, as additional facts pleaded in the proposed amended complaint further support allegations of disparate treatment based on the plaintiff's protected characteristics (e.g., that Mikel Vick witnessed discriminatory treatment toward the plaintiff and later experienced such treatment himself, and that Vick was similarly situated to the plaintiff), the proposed amended complaint also withstands 12(b)(6) scrutiny.

### ii. *Retaliation Claim (Count VI)*

Title VII prohibits employers from retaliating against an employee because the employee has opposed an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–64 (2006). "[A]n employee is protected when []he opposes not only . . . employment actions actually unlawful under Title VII but also employment actions [he] reasonably believes to be unlawful.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (quotation marks and citation omitted).

To state a plausible claim for retaliation under Title VII, a plaintiff must allege "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Barnhill*, 138 F.4th at 132. The first element is satisfied by the plaintiff's initiation of EEO proceedings—both formal and informal—in July 2021, April 2023, July 2023, February 2025, and April 2025. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 59 (protected activities include making a charge or participating in a Title VII investigation); ECF No. 46-4 ¶¶ 13, 33, 40, 99, 105.

As for the second element, the plaintiff alleges an abundance of adverse employment actions taken against him following his various EEO complaints, but his allegations regarding Marshall are sufficient for purposes of overcoming the 12(b)(6) plausibility threshold. In a staff meeting that occurred two days after the plaintiff filed his informal EEO complaint, Marshall attempted to dissuade the plaintiff from pursuing his EEO complaint, and/or suggested that the plaintiff was not promoted to

22

the GS-14 position due to pursuing his first EEO complaint, by telling the plaintiff that he "should be careful . . . because you never know who knows who," "be mindful not to burn bridges because you could end up working for someone *or not*," and "what you do could—or will—come to bite you," followed by congratulating the individual promoted to the GS-14 position. ECF No. 46-4 ¶¶ 33–34 (emphasis added). Marshall also "repeatedly and arbitrarily reassigned work away" from the plaintiff to his Caucasian and white coworkers, *id.* ¶ 19; and when the plaintiff completed an assignment, Marshall misattributed the credit to non-African American and non-Black coworkers with no prior EEO activity, *id.* ¶ 20.

The third element—establishing a causal connection—is "not an onerous burden" at this stage. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335 (4th Cir. 2018). "Purported victims of retaliation do not have to show . . . that their protected activities were but-for causes of the adverse action." *Id.* Instead, the plaintiff may raise an inference of causation "simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* "[T]emporal proximity" may be sufficient to establish causation when "the gap between the protected activity and the adverse employment action [is] no longer than two months." *Barnhill*, 138 F.4th at 132. And causation may also be established "through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity." *Id.* (citing *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (causation established where

supervisor told plaintiff that they "would be involved" in the EEO complaint)) (other citation omitted).

The plaintiff's proposed amended complaint avers that Marshall became aware of the plaintiff's first formal EEO complaint when Marshall took over as the plaintiff's supervisor in March 2022, and Marshall expressly told the plaintiff that he was aware of the EEO complaint during a May 2022 meeting. ECF No. 46-4 ¶¶ 17-18. Marshall began assigning work away from the plaintiff and misattributing credit for the plaintiff's work immediately thereafter. *Id.* ¶¶ 19–20. Accordingly, the plaintiff has raised an inference of causation based on temporal proximity. *See Strothers*, 895 F.3d at 335. And although the plaintiff does not specifically plead that Marshall was aware of the plaintiff's filing of an informal EEO complaint in April 2023, the timing of Marshall's remarks just two days later plausibly suggests that these remarks—and potentially the failure to promote the plaintiff to the GS-14 position—were motivated by "disdain for or intermeddling with the protected activity." *Barnhill*, 138 F.4th at 132. Additionally, or in the alternative, Marshall's meeting remarks are close enough in time to his learning of the plaintiff's previous EEO activity to raise an inference of causation based on temporal proximity; Marshall learned of the plaintiff's first formal EEO complaint upon Marshall's hiring in March 2022, and the staff meeting remarks were made the next month. *Id.* ¶¶ 14, 17–18, 34.

Accordingly, because the plaintiff has pleaded facts that state a plausible claim for retaliation under Title VII, the motion to amend to add facts relevant to Count VI will be granted.

24

### iii.    Hostile Work Environment Claims (Counts I, II, and III)

As previously noted, Title VII prohibits employment practices that discriminate against an employee based on race or color "with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile work environment cause of action." *E.E.O.C. v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986)). To state a plausible hostile work environment claim, a plaintiff must allege the following: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Decoster v. Becerra*, 119 F.4th 332, 337 (4th Cir. 2024) (quotation marks and citation omitted).

The plaintiff alleges that he was subjected to a hostile work environment based on race, color, and retaliation. As an initial matter, it is undisputed that the plaintiff satisfies the first and fourth prongs. The plaintiff sufficiently pleads that he experienced unwelcome conduct;[16] and, pursuant to 42 U.S.C. § 2000e(b), any

---

[16] The first prong, unwelcome conduct, "is not a high hurdle," and a plaintiff "can demonstrate that certain conduct is unwelcome simply by voicing [their] objection to the alleged harasser or to the employer." *Strothers*, 895 F.3d at 328–29. Additionally, "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008)("[I]t is difficult to see how any employee would welcome derisive behavior directed at his faith.")). Here, it is difficult to imagine how any employee would welcome the alleged conduct, which the plaintiff objected to on numerous occasions—through formal and

25

harassment perpetrated by a supervisor, such as Barclift, Radich, and Marshall,[17] is imputable to the employer. *Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 658 (4th Cir. 1990); *see also Strothers*, 895 F.3d at 333 ("If the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions."). However, the parties disagree as to whether the plaintiff has sufficiently alleged a causal nexus between the unwelcome conduct and the plaintiff's protected status, and whether the unwelcome conduct was sufficiently severe or pervasive to create a hostile work environment.

The second prong requires a causal nexus between the offending conduct and the plaintiff's protected status. *See Strothers*, 895 F.3d at 329. In other words, the plaintiff must plead facts that allow the Court to infer that "but for" his protected status, he would not have been the victim of the offending conduct. *See Causey v.*

---

informal EEO complaints and numerous reports to senior management—and twice took FMLA leave to escape. ECF No. 46-4 ¶¶ 60, 77, 79.

[17] For purposes of imputed liability under Title VII, a supervisor is an individual who has been "empowered . . . to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (quotation marks and citation omitted) (italics removed).

The plaintiff identifies Barclift, Radich, Marshall, RADM Cahill, COS Walch, and COS Kellum as his supervisors during the relevant period. ECF No. 46-4 ¶¶ 15, 17, 53, 158, 170, 182. However, the plaintiff also states that Barclift at times referred to herself as the plaintiff's "unofficial" supervisor, and that Barclift directed Radich and Marshall to serve as the plaintiff's "unofficial" first-line supervisors. *Id.* ¶¶ 16, 39, 47. The Court cannot now determine whether the plaintiff will be able to show that these individuals were, in fact, supervisors whose conduct is imputable to the Navy under Title VII. At this stage, however, the plaintiff has alleged facts that, if true, could demonstrate that the individuals who perpetrated the unwelcome conduct were his supervisors and, as such, that their conduct is imputable to the Navy.

*Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Such animosity can be shown by alleging "differential treatment of similarly situated" employees outside the plaintiff's protected groups. *Id.*; *see also Sterling v. Tenet*, 416 F.3d 338, 345 (4th Cir. 2005) (a plaintiff may "raise an inference of discriminatory intent by showing that [they were] treated worse than similarly situated employees of other races").

The plaintiff plausibly alleges that numerous instances of alleged harassment were attributable to his supervisors' animus toward his race, color, and protected EEO activity. In addition to failure-to-promote, the plaintiff states that his supervisors:

(1)    minimized engagement with him by directing non-supervisory personnel to supervise him, yet did not do the same for colleagues who held a materially identical position as the plaintiff but were not members of his protected groups, ECF No. 46-4 ¶¶ 4, 15, 23, 67, 112, 126, 141, 155, 167, 179;

(2)    told the plaintiff that he "need[s] to learn to speak plain English," referring to his cultural dialect, *id.* ¶¶ 4, 27, 35, 112, 126, 141, 155, 167, 179;

(3)    arbitrarily reassigned tasks away from the plaintiff to his white-skinned, Caucasian colleagues, *id.* ¶ 19, and credited white-skinned Caucasian employees for work completed by the plaintiff, *id.* ¶¶ 4, 20, 112, 126, 141, 155, 167, 179;

(4)    manipulated the plaintiff's timecards as a means of later accusing the plaintiff of improprieties, including timecard fraud, *id.* ¶¶ 4, 41–42, 83, 112, 126, 141, 155, 167, 179;

(5)    issued the plaintiff a negative performance review containing inaccurate information, and then refused to discuss the evaluation with the plaintiff, *id.* ¶¶ 4, 69–70, 112, 126, 141, 155, 167, 179;

(6)    pursued baseless allegations of misconduct against the plaintiff, *id.* ¶¶ 4, 71–75, 97, 112, 126, 141, 155, 167, 179;

(7)    ordered the plaintiff not to speak to or interact with other workplace minorities, *id.* ¶¶ 4, 56, 112, 126, 141, 155, 167, 179;

(8)    issued the plaintiff conflicting orders, including regarding meeting attendance and communication standards, to set the plaintiff up for failure, *id.* ¶¶ 4, 45, 53, 58, 112, 126, 141, 155, 167, 179;

(9)    deleted time sheet information so the plaintiff would not be paid, *id.* ¶¶ 4, 50, 112, 126, 141, 155, 167, 179;

(10)    deleted a document from the plaintiff's personnel file, then claimed that the plaintiff never submitted the document, *id.* ¶¶ 4, 49, 112, 126, 141, 155, 167, 179;

(11)    intentionally interfered with the plaintiff's utilization of his maxiflex schedule, *id.* ¶¶ 4, 58–59, 79, 84, 112, 126, 141, 155, 167, 179;

(12)    denied the plaintiff compensatory time for hours worked beyond his tour of duty, *id.* ¶¶ 4, 95, 112, 126, 141, 155, 167, 179;

(13)    required the plaintiff to detail what work he was going to complete when teleworking, but did not require the same of his colleagues with no prior EEO activity, *id.* ¶ 21;

(14)    dismissed the plaintiff from meetings when he endeavored to offer his subject matter expertise, but accepted identical input from similarly situated colleagues of a different race, color, and without prior EEO activity, *id.* ¶ 65;

(15)    openly bragged to the plaintiff in front of other employees about doing "whatever was necessary" to

have the plaintiff terminated, *id.* ¶¶ 76, 112, 126, 141, 179;

(16) prevented the plaintiff from being selected for a general engineer position in another command, *id.* ¶¶ 4, 98, 112, 126, 141, 155, 167, 179; and

(17) reassigned the plaintiff to a different directorate with a demotion, under the false guise that doing so removed him from Barclift's command, *id.* ¶¶ 4, 100–101, 112, 126, 141, 155, 167, 179.

The plaintiff states that his colleagues of a different race and/or color, and without prior EEO activity,[18] did not experience the aforementioned unwelcome conduct. *See, e.g.,* ECF No. 46-4 ¶¶ 21, 65, 67, 113. And the plaintiff alleges that at least some of these colleagues—including Waldrop, Vick, and Patel—were similarly situated, in that they were performing substantially similar duties and/or "held an essentially identical position," and had the same supervisor(s). *Id.* ¶¶ 23, 61, 65–67. Thus, the plaintiff has sufficiently alleged "differential treatment of similarly situated [] employees" outside his protected groups. *Causey*, 162 F.3d at 801.

The plausibility that the supervisors' conduct was motivated by animus toward the plaintiff's protected classes is further supported by the plaintiff's assertions that: his supervisors articulated conflicting reasoning for many of the adverse actions, ECF No. 46-4 ¶¶ 113, 127, 142, 157, 169, 181; Vick, a similarly situated African American colleague with lighter complexion, witnessed the disparate treatment toward the

---

[18] The plaintiff also states that the unwelcome conduct occurred only *after* he pursued his EEO complaints and informal reports of harassment. ECF No. 46-4 ¶ 142. The temporal proximity of the supervisors' conduct allows the Court to infer that the harassment was plausibly motivated by animus toward the plaintiff's ongoing protected EEO activity.

plaintiff and later experienced it himself, *id.* ¶¶ 61, 65–66; Barclift remarked negatively about the plaintiff's cultural dialect, *id.* ¶¶ 4, 27, 35, 112, 126, 141, 155, 167, 179; and Marshall suggested that the plaintiff was not and/or would not be promoted due to his previous and ongoing EEO complaints, *id.* ¶¶ 4, 34, 113, 126, 141, 155, 167, 179. Altogether, the plaintiff has done more than enough to allow this Court to plausibly infer that, but for the plaintiff's protected characteristics, he would not have been the victim of some or all of the unwelcome conduct.

Finally, to satisfy the third prong, the plaintiff must demonstrate that his work environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citation omitted). The conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," and the victim must "subjectively perceive the environment to be abusive." *Id.* at 21–22.

In assessing whether the unwelcome conduct is objectively "hostile" or "abusive," courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Even when each alleged incident, standing alone, is not severe enough to establish a hostile work environment, the "cumulative effect of individual acts" may create one.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Additionally, "the status of the harasser may be a significant factor," as "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Boyer-Liberto*, 786 F.3d at 278 (quotation marks and citations omitted).

Importantly, complaints premised on nothing more than "rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable," under Title VII, and "[i]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019). Likewise, complaints premised merely on disagreements with "isolated personnel decisions" cannot form the basis of a hostile work environment claim. *Pueschel v. Peters*, 577 F.3d 558, 566 (4th Cir. 2009).

With respect to his claims of hostile work environment based on race and color, the plaintiff has plausibly alleged that his supervisors' conduct was sufficiently severe and pervasive to create an abusive atmosphere that altered the conditions of his employment. The plaintiff subjectively perceived his work environment to be so unbearably hostile and abusive that he resorted to taking FMLA leave twice to escape it. ECF No. 46-4 ¶¶ 60, 79. And a reasonable person considering all the circumstances asserted here could objectively view the plaintiff's workplace as "permeated with discriminatory intimidation, ridicule, and insult."[19] *Harris*, 510 U.S. at 21 (citation

---

[19] It is possible that the alleged unwelcome conduct will ultimately amount to nothing more than "rude treatment," "routine difference[s] of opinion and personality conflict," and routine "personnel decisions." *Evans*, 936 F.3d at 192; *Pueschel*, 577

and quotation marks omitted). The plaintiff alleges a relentless, coordinated effort amongst supervisors over the course of years to sabotage his promotion potential and career trajectory; humiliate and intimidate him, including in front of his colleagues; alienate him from other workplace minorities; and deprive him of basic elements of his position—including various job duties, schedule benefits, and even his pay.

Specific to his retaliatory hostile work environment claim, the plaintiff must show that he was "placed in a 'retaliatory hostile work environment . . . so severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Barnhill*, 138 F.4th at 140 (quoting *Laurent-Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022)). Claims based on "petty slights or minor annoyances" will not suffice. *Laurent-Workman*, 54 F.4th at 218. However, allegations of individual incidents that would "not amount to much when considered in isolation" may, when considered together, "tell a multi-act story" of retaliatory harassment that would dissuade a reasonable employee from following through with their complaints. *Id.* Here, too, the plaintiff has met his burden, as he paints a picture of an ongoing, coordinated effort amongst supervisors to sabotage, ridicule, and intimidate him to deter him from pursuing his discrimination claims, or, alternatively, to have him terminated in retaliation for such claims.

---

F.3d at 566. However, at this stage, the Court is required to accept the plaintiff's well-pleaded facts as true and to draw all reasonable factual inferences from those facts in his favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (1999).

Because the plaintiff has plausibly stated a claim of hostile work environment based on race, color, and retaliation against protected EEO activity, the motion to amend to add facts relevant to Counts I, II, and III will be granted.

### iv. *Administrative Exhaustion Under 42 U.S.C. § 2000e-16(c)*

The defendants argue that the plaintiff has not exhausted his administrative remedies with respect to the claims contained within this third EEO complaint. ECF No. 47 at 6–8. The defendants contend that because the plaintiff exercised his right to request a hearing and decision by the EEOC after he received a report of investigation (ROI), he cannot file a civil action related to those claims until the agency takes final action. *Id.* The defendants are incorrect.

Under 42 U.S.C. § 2000e-16(c), a civil action may be filed "[w]ithin 90 days of receipt of notice of final action taken by a department [or] agency . . . or after [180] days from the filing of the initial charge with the department [or] agency . . . until such time as final action may be taken." An individual may file a civil action not only when "aggrieved by the final disposition of his complaint" but also when aggrieved by "the *failure to take final action* on his complaint." 42 U.S.C. § 2000e-16(c) (emphasis added).

In the Fourth Circuit, Title VII's exhaustion requirement operates not as a jurisdictional bar but as a statutory prerequisite to filing suit—"akin to a claim-processing rule that imposes procedural obligations on litigants, rather than

implicates judicial authority to hear a class of cases."[20] *Stewart v. Iancu*, 912 F.3d 693, 701 (4th Cir. 2019) (quotation marks omitted). Title VII's 180-day waiting period is "satisfied by agency *inaction*" and is designed to "permit[] sufficient, but finite, time for the agency to address the discrimination charges in the first instance." *Id.* at 699. Accordingly, 42 USC § 2000e-16 does not require the plaintiff to wait until an agency takes final action to pursue his claims in federal court.

The plaintiff filed his third formal EEO complaint on April 3, 2025. ECF No. 46-1 at 2 ¶ 6; ECF No. 46-2 at 1. More than 180 days passed between that time and the plaintiff's filing of his motion to amend on November 17, 2025. ECF No. 46. Although the plaintiff has received a ROI and elected to have a hearing before an EEOC Administrative Judge, the agency has not taken final action. ECF No. 46-1 at

---

[20] Although the defendants cite caselaw to the contrary, *Kennington v. I.R.S.*, it is inapplicable here. ECF No. 47 at 7–8. Unlike in the Fourth Circuit, "[i]n the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to bringing Title VII claims in federal court." *Kennington v. I.R.S.*, 1:10-cv-9, 2010 WL 3394669, at *1 (D. Utah Aug. 27, 2010) (concluding that the plaintiff had not exhausted his administrative remedies because his administrative claims were still pending before the EEOC); *see Stewart*, 912 F.3d at 699 (acknowledging that "courts [in other circuits] have regularly characterized [42 U.S.C. §] 2000e-16(c)'s 180-day waiting period as an exhaustion requirement," but declining to do the same).

The defendants also cite *Holmes v. Esper* as "describing [the] exhaustion process," but that is a mischaracterization. ECF No. 47 at 6–7. *Holmes* outlines the procedural steps that an EEO complaint goes through and explains routes a complainant may take at various stages in the process. No. 3:17-cv-683, 2019 WL 6094255, at *2 (D.S.C. July 23, 2019). But *Holmes* says nothing about the exhaustion process.

2 ¶ 7; ECF No. 46-3 at 1–2. Thus, the plaintiff is entitled to proceed with his civil action as to the claims contained in his third formal EEO complaint.[21]

## B.    Motion to Dismiss

### i.    *Subject Matter Jurisdiction*

The defendants correctly assert that the Court lacks subject matter jurisdiction over Barclift, Marshall, and Radich because they are improper defendants under Title VII. "The language of 42 U.S.C. § 2000e-16(c) is clear; the head of the department for which the [federal employee] works is the proper defendant in a . . . race discrimination suit[;]" and when the plaintiff "works for the Department of the Navy, the Secretary of the Navy is the proper party." *Gardner v. Gartman*, 880 F.2d 797, 799 (4th Cir. 1989); 42 U.S.C. § 2000e-16(c) (stipulating that "the head of the department, agency, or unit . . . shall be the defendant" in a civil action filed by a federal employee under Title VII).

However, the plaintiff's proposed amended complaint—now the operative complaint—removes Barclift, Marshall, and Radich as defendants, leaving John Phelan, Secretary of the Navy, as the only remaining defendant. ECF No. 46-4 at 2.

---

[21] Because there is no exhaustion issue here, the Court does not reach the defendants' third argument that the proposed amendments are not "like or reasonably related to" charges in the plaintiff's original administrative complaint. ECF No. 47 at 8; *see Stewart*, 912 F.3d at 706 ("[P]laintiffs may bring Title VII claims for the first time before a district court, so long as they are like or reasonably related to charges in the original administrative complaint, and if they reasonably could have developed from the agency's investigation of the original complaint.").

Therefore, the Court will deny the motion to dismiss for lack of subject matter jurisdiction as moot.

### ii.    *Service of Process*

The defendants present two separate challenges relating to defective service—a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, and a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process. Both challenges will be denied as moot, as the plaintiff was granted an extension of time and has since properly served the proper defendant—John Phelan, Secretary of the Navy—pursuant to Fed. R. Civ. P. 4(i).[22]

### iii.    *Failure to State a Claim*

Consistent with the above futility analysis, *supra* Part III.A.i–iii, the plaintiff's complaint withstands Fed. R. Civ. P. 12(b)(6) scrutiny as to all counts. Therefore, the defendants' motion to dismiss for failure to state a claim will also be denied.

## IV.    CONCLUSION

The plaintiff's motion for leave to file an amended complaint (ECF No. 46) is **GRANTED**. The defendants' motion to dismiss (ECF No. 12) is **DENIED** as to failure to state a claim and is **DENIED AS MOOT** as to lack of personal jurisdiction and insufficient service of process.[23]

---

[22] On July 21, 2025, the Honorable United States Magistrate Judge Lawrence R. Leonard granted the plaintiff's motion for extension of time to serve process. ECF No. 29. Pursuant to Fed. R. Civ. P. 4(i), to properly serve process on the defendant "merely requires [the p]laintiff to utilize certified mail to serve the Attorney General and the United States Attorney." *Id.* The plaintiff was given until August 4, 2025, to properly serve process on the defendant. *Id.* Service was effectuated as to both the United States Attorney and the Attorney General on July 29, 2025. ECF Nos. 36, 39, 44.

The plaintiff is **DIRECTED** to re-file the second amended complaint, ECF No. 46-4, as a first amended complaint no later than February 16, 2026. Thereafter, the defendant is **DIRECTED** to respond to the plaintiff's first amended complaint within the time prescribed by the Federal Rules of Civil Procedure.

    **IT IS SO ORDERED**.

/s/

Jamar K. Walker
United States District Judge

Norfolk, Virginia
February 11, 2026

---

[23] The Clerk's Office is **DIRECTED** to terminate Jane Ann Barclift, Douglas Marshall, and Maggie Radich as defendants in this case.